# EXHIBIT A

la

## STATE OF MICHIGAN

### IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

BUCKS COUNTY EMPLOYEES RETIREMENT FUND,
Individually and on Behalf of All Others Similarly Situated,

§
§
§
§
§

Plaintiff,

§
§

vs.

§
§
§

ALLY FINANCIAL INC., MICHAEL A. CARPENTER,
CHRISTOPHER A. HALMY, DAVID J. DEBRUNNER,
ROBERT T. BLAKELY, MAYREE C. CLARK,
STEPHEN A. FEINBERG, KIM S. FENNEBRESQUE,
GERALD GREENWALD, FRANKLIN W. HOBBS,
BRIAN P. MACDONALD, MARJORIE MAGNER,
HENRY S. MILLER, MATHEW PENDO, CITIGROUP
GLOBAL MARKETS INC., GOLDMAN, SACHS & CO.,
MORGAN STANLEY & CO. LLC, BARCLAYS
CAPITAL INC., MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED, DEUTSCHE BANK
SECURITIES INC., J.P. MORGAN SECURITIES LLC,
SANDLER O'NEILL & PARTNERS, L.P., KEEFE,
BRUYETTE & WOODS, INC., CREDIT SUISSE
SECURITIES (USA) LLC, EVERCORE GROUP L.L.C.,
RBC CAPITAL MARKETS, LLC, SCOTIA CAPITAL
(USA) INC., CREDIT AGRICOLE SECURITIES (USA)
INC., RAYMOND JAMES & ASSOCIATES, INC., SG
AMERICAS SECURITIES, LLC, GUGGENHEIM
SECURITIES, LLC, SANFORD C. BERNSTEIN & CO.,
LLC, GLOBAL HUNTER SECURITIES, LLC, HEIGHT
SECURITIES, LLC, JMP SECURITIES LLC, LOOP
CAPITAL MARKETS LLC, BLAYLOCK BEAL VAN,
LLC, CASTLEOAK SECURITIES, L.P., MISCHLER
FINANCIAL GROUP, INC., THE WILLIAMS CAPITAL
GROUP, L.P., C.L. KING & ASSOCIATES, INC.,
LEBENTHAL & CO., LLC, MFR SECURITIES, INC.,
SAMUEL A. RAMIREZ & COMPANY, INC., DREXEL
HAMILTON, LLC, MURIEL SIEBERT & CO., INC.,
TELSEY ADVISORY GROUP LLC, TOUSSAINT
CAPITAL PARTNERS, LLC, ACADEMY SECURITIES
INC., FREEMAN & CO. SECURITIES LLC, and WM
SMITH & CO.,

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Defendants.

§
§

16-013616-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
10/21/2016 4:31:54 PM
CATHY M. GARRETT

**CLASS ACTION
COMPLAINT AND
DEMAND
FOR JURY TRIAL**

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE SECURITIES ACT OF 1933

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.

By:   /s/ David H. Fink
      David H. Fink (P28235)
      Attorney for Plaintiff

Plaintiff Bucks County Employees Retirement Fund ("Bucks County" or "Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things, a review of Securities and Exchange Commission ("SEC") filings made by Ally Financial Inc. ("Ally" or the "Company"), analyst and media reports, and other commentary analyses concerning Ally. Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this action under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against (1) Ally; (2) certain of Ally's senior executives and directors who signed the Registration Statement (as defined below) in connection with the Company's April 11, 2014 Initial Public Offering ("IPO" or the "Offering"); and (3) each of the investment banks

that acted as underwriters for the Offering.  In the Offering, the Company and the underwriters sold 95,000,000 shares of common stock at a price to the public of $25 per share.

2.      Defendant Ally is a diversified financial services company that provides a range of financial products and services primarily to automotive dealers and their retail customers in the United States.  Ally serves approximately 784,000 customers and also has online banking and corporate finance branches.  Ally has come under fire from regulators in recent years for subprime auto loan lending practices, including discriminatory pricing and illegal debt collection methods. The Company was formerly known as GMAC Inc. and changed its name to Ally Financial Inc. in May 2010.  Ally was founded in 1919 and is headquartered in Detroit, Michigan. Ally's common stock is listed and traded on the NYSE under the ticker symbol "ALLY."

3.      On or around April 11, 2014, Ally conducted the Offering, selling 95,000,000 common shares at a price to the public of $25 per share.

4.      In late December 2014, Ally disclosed that it had received a subpoena from the U.S. Department of Justice as part of an investigation "related to subprime automotive finance and related securitization activities" in addition to an inquiry by the SEC.  The Company stated that on October 31, 2014 it had received a request for documents from the SEC in connection with that agency's inquiry into subprime loans.

5.      In violation of the Securities Act, Defendants negligently issued untrue statements of material facts and omitted to state material facts required to be stated from the Registration Statement and incorporated Offering Materials that the Company filed with the SEC in support of the Offering. Defendants are strictly liable for any and all material untrue statements or omissions in the Offering Materials.  Furthermore, because this case involves a Registration Statement, Defendants also had an independent, affirmative duty to provide adequate disclosures about

adverse conditions, risks, and uncertainties. *See* Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii). Thus, Defendants had an affirmative duty to ensure that the Registration Statement and the materials incorporated therein disclosed material trends and uncertainties that they knew, or should have reasonably expected, would have a materially adverse impact on Ally's business. Defendants failed to fulfill this obligation as well.

6.      Unbeknownst to investors, the Registration Statement's representations were materially untrue, inaccurate, misleading, and/or incomplete because, upon information and belief, at the time of the Offering, the Company failed to disclose: (1) the severity of rising subprime auto loan delinquency rates; (2) deficient underwriting measures employed in the origination of its subprime auto loans; and (3) aggressive tactics used with low-income borrowers (*e.g.*, pushing borrowers to limits beyond what they can afford, falsifying income) in order to raise approximately $2.375 billion in its April 2014 Offering.

7.      Unfortunately for investors, the truth concerning the nature and extent of the problems facing the Company did not begin to emerge until the Offering was complete when, on October 29, 2015, Ally reported a 37% drop in quarterly profits compared to the third quarter of 2014. Chief Financial Officer ("CFO"), Christopher Halmy, said the deterioration reflected a decision Ally made a few years ago to take on riskier loans. On this news, Ally shares fell approximately 4.11%.

8.      On June 2, 2016, after the market closed, the *Wall Street Journal* published an article entitled "J.P. Morgan Chief James Dimon Sounds Alarm on Car Loans." The article stated that Mr. Dimon sees an increased risk due to higher default rates from increased subprime lending. On the next day, June 3, 2016, an *Automotive News* article reported that Ally CEO Jeffrey Brown said, "Ally is dialing back on lending to consumers at the lower end of the subprime credit score

3

spectrum." The article also stated that "[e]xecutives at some of the biggest banks in auto lending . . . [are] tapping the brakes on subprime lending, especially at the lower end of the credit spectrum." On this news, Ally shares fell from $18.51 per share on June 2 to $17.69 per share on June 3, a drop of over 4.43%.

9.      Additionally, on June 14, 2016, a *Wall Street Journal* article entitled "Credit-Card Warning Sends Synchrony Shares Dropping" stated that "auto loans [] are weakening, suggesting that a new round of borrower delinquencies and losses for financial institutions could be on the way." On this news, Ally shares fell from $17.03 per share on June 13 to $16.08 per share on June 14, a drop of over 5.58%.

10.     On July 11, 2016, a *CNN Money* article entitled "U.S. government worried about risky car loans" stated that "The Office of the Comptroller of the Currency (OCC) cited 'unprecedented' growth in auto loans, rising delinquencies and shrinking used car values," as well as "pointed to cutthroat competition among banks, which has led them to relax underwriting standards."

11.     On July 28, 2016, the *Wall Street Journal* published an article entitled "Alarm Bells for Auto Loans" reported the following, in pertinent part:

> Four of the largest auto lenders by loan volume – Ally Financial, Wells Fargo, J.P. Morgan Chase and Capital One Financial – said on second-quarter earnings calls that used-cars prices are at risk of falling. Ally's finance chief Christopher Halmy this week said pressure on used-car prices could grow as cars getting leased now return to the market in three years.
>
> * * *
>
> Declining values would be an additional issue for the auto-loan industry, where default expectations for subprime loans are rising.
>
> * * *

4

Ally's Mr. Halmy said the cars getting leased today are "the biggest concern" for used-car prices. He added that used-car prices have held up better than expected so far.

12.     For all of the claims stated herein, Plaintiff expressly excludes any allegation that could be construed as alleging fraud or intentional or reckless misconduct.  Plaintiff's claims are based solely on claims of strict liability under the Securities Act.  By this action, Plaintiff, individually and on behalf of the other Class members, who also acquired the Company's shares pursuant or traceable to the Offering, now seeks to obtain a recovery for the damages it has suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to Mich. Const. art. 6, §1 and §22 of the federal Securities Act, 15 U.S.C. §77v.  Defendants' principal place of business is located in the State of Michigan and many of the Defendants have offices in Michigan.

14.     This action is not removable.  The claims alleged herein arise under §§11, 12(a)(2), and 15 of the Securities Act.  *See* 15 U.S.C. §§77k, 77l(a)(2), and 77o.  Section 22 of the Securities Act, 15 U.S.C. §77v, expressly states that "[e]xcept as provided in [section 16(c)], no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States."  15 U.S.C. §77v(a).  Section 16(c) refers to "covered class action[s] brought in any State court involving a covered security, as set forth in subsection (b)" (15 U.S.C. §77p(c)); and subsection (b) of §16, in turn, includes within its scope only covered class actions "based upon the statutory or common law of any State or subdivision thereof."  15 U.S.C. §77p(b).  This is an action asserting only federal law claims.  Thus, this action is not removable to federal court.

5

15.     This Court has personal jurisdiction over each of the Defendants pursuant to Mich. Comp. Laws Ann. §§600.711 and 600.715 because they are either citizens of the State of Michigan and/or the claims and allegations asserted herein arise from conduct and actions taken by the Defendants, which occurred within the State of Michigan, including the operations of Ally and various Board of Directors ("Board") meetings, such that due process of law will not be offended by this Court's exercise of personal jurisdiction over each of the Defendants.

16.     Venue is proper pursuant to Mich. Comp. Laws Ann. §600.1621 because many of the Defendants have places of business in Wayne County, Ally has its principal place of business located within Wayne County, and numerous actions relating to the claims at issue in this action occurred within this Court's venue, including the preparation and dissemination of the materially inaccurate, misleading, and incomplete Registration Statement and Prospectus (which was prepared by Defendants, or with their participation, acquiescence, encouragement, cooperation, and/or assistance), which occurred in whole, or in substantial part, in this County.

<div align="center">PARTIES</div>

A.    **Plaintiff**

17.     Plaintiff purchased shares of Ally stock pursuant and/or traceable to the untrue and misleading Registration Statement and was damaged thereby.

B.    **Defendants**

18.     Defendant Ally is a diversified financial services company that provides a range of financial products and services primarily to automotive dealers and their retail customers in the United States. The Company was formerly known as GMAC Inc. and changed its name to Ally Financial Inc. in May 2010. Ally was founded in 1919 and is headquartered in Detroit, Michigan. Ally's common stock is listed and traded on the NYSE under the ticker symbol "ALLY."

<div align="center">6</div>

19.     Defendant Michael A. Carpenter ("Carpenter") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and a director of the Company. Defendant Carpenter signed, or authorized the signing of, the Registration Statement.

20.     Defendant Christopher A. Halmy ("Halmy") was, at all relevant times, the Company's CFO. Defendant Halmy signed, or authorized the signing of, the Registration Statement.

21.     Defendant David J. Debrunner ("Debrunner") was, at all relevant times, a Vice President, Chief Accounting Officer, and Corporate Controller of the Company. Defendant Debrunner signed, or authorized the signing of, the Registration Statement.

22.     Defendant Robert T. Blakely ("Blakely") was, at all relevant times, a director of the Company. Defendant Blakely signed, or authorized the signing of, the Registration Statement.

23.     Defendant Mayree C. Clark ("Clark") was, at all relevant times, a director of the Company. Defendant Clark signed, or authorized the signing of, the Registration Statement.

24.     Defendant Stephen A. Feinberg ("Feinberg") was, at all relevant times, a director of the Company. Defendant Feinberg signed, or authorized the signing of, the Registration Statement.

25.     Defendant Kim S. Fennebresque ("Fennebresque") was, at all relevant times, a director of the Company. Defendant Fennebresque signed, or authorized the signing of, the Registration Statement.

26.     Defendant Gerald Greenwald ("Greenwald") was, at all relevant times, a director of the Company. Defendant Greenwald signed, or authorized the signing of, the Registration Statement.

27.     Defendant Franklin W. Hobbs ("Hobbs") was, at all relevant times, a director of the Company. Defendant Hobbs signed, or authorized the signing of, the Registration Statement.

28.     Defendant Brian P. MacDonald ("MacDonald") was, at all relevant times, a director of the Company. Defendant MacDonald signed, or authorized the signing of, the Registration Statement.

29.     Defendant Marjorie Magner ("Magner") was, at all relevant times, a director of the Company. Defendant Magner signed, or authorized the signing of, the Registration Statement.

30.     Defendant Henry S. Miller ("Miller") was, at all relevant times, a director of the Company. Defendant Miller signed, or authorized the signing of, the Registration Statement.

31.     Defendant Mathew Pendo ("Pendo") was, at all relevant times, a director of the Company. Defendant Pendo signed, or authorized the signing of, the Registration Statement.

32.     Defendants Carpenter, Halmy, Debrunner, Blakely, Clark, Feinberg, Fennebresque, Greenwald, Hobbs, MacDonald, Magner, Miller, and Pendo are collectively referred to herein as the "Individual Defendants."

33.     The Individual Defendants each participated in the preparation of, and signed (or authorized the signing of), the Registration Statement.  Defendant Ally and the Individual Defendants, who signed (or authorized the signing of) the Registration Statement, are strictly liable for the materially untrue and misleading statements incorporated into the Registration Statement. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Ally's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

34.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the Offering.  In the Offering, Citigroup agreed to purchase 14,725,000 Ally shares.

8

35.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter for the Offering. In the Offering, Goldman Sachs agreed to purchase 14,725,000 Ally shares.

36.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the Offering. In the Offering, Morgan Stanley agreed to purchase 14,725,000 Ally shares.

37.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter for the Offering. In the Offering, Barclays agreed to purchase 14,725,000 Ally shares.

38.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter for the Offering. In the Offering, Merrill Lynch agreed to purchase 4,845,000 Ally shares.

39.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter for the Offering. In the Offering, Deutsche Bank agreed to purchase 4,845,000 Ally shares.

40.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the Offering. In the Offering, J.P. Morgan agreed to purchase 4,845,000 Ally shares.

41.     Defendant Sandler O'Neill & Partners, L.P. ("Sandler O'Neill") was an underwriter for the Offering. In the Offering, Sandler O'Neill agreed to purchase 2,945,000 Ally shares.

42.     Defendant Keefe, Bruyette & Woods, Inc. ("Keefe") was an underwriter for the Offering. In the Offering, Keefe agreed to purchase 2,185,000 Ally shares.

43.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter for the Offering. In the Offering, Credit Suisse agreed to purchase 1,377,500 Ally shares.

44.     Defendant Evercore Group L.L.C. ("Evercore") was an underwriter for the Offering. In the Offering, Evercore agreed to purchase 2,185,000 Ally shares.

9

45.    Defendant RBC Capital Markets, LLC ("RBC") was an underwriter for the Offering. In the Offering, RBC agreed to purchase 2,185,000 Ally shares.

46.    Defendant Scotia Capital (USA) LLC ("Scotia") was an underwriter for the Offering. In the Offering, Scotia agreed to purchase 1,377,500 Ally shares.

47.    Defendant Credit Agricole Securities (USA) Inc. ("Credit Agricole") was an underwriter for the Offering. In the Offering, Credit Agricole agreed to purchase 855,000 Ally shares.

48.    Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter for the Offering. In the Offering, Raymond James agreed to purchase 855,000 Ally shares.

49.    Defendant SG Americas Securities, LLC ("SG Americas") was an underwriter for the Offering. In the Offering, SG Americas agreed to purchase 855,000 Ally shares.

50.    Defendant Guggenheim Securities, LLC ("Guggenheim") was an underwriter for the Offering. In the Offering, Guggenheim agreed to purchase 665,000 Ally shares.

51.    Defendant Sanford C. Bernstein & Co., LLC ("Sanford") was an underwriter for the Offering. In the Offering, Sanford agreed to purchase 665,000 Ally shares.

52.    Defendant Global Hunter Securities ("Global Hunter") was an underwriter for the Offering. In the Offering, Global Hunter agreed to purchase 665,000 Ally shares.

53.    Defendant Height Securities, LLC ("Height") was an underwriter for the Offering. In the Offering, Height agreed to purchase 475,000 Ally shares.

54.    Defendant JMP Securities LLC ("JMP") was an underwriter for the Offering. In the Offering, JMP agreed to purchase 475,000 Ally shares.

55. Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter for the Offering. In the Offering, Loop Capital agreed to purchase 475,000 Ally shares.

56. Defendant Blaylock Beal Van, LLC ("Blaylock") was an underwriter for the Offering. In the Offering, Blaylock agreed to purchase 308,750 Ally shares.

57. Defendant CastleOak Securities, L.P. ("CastleOak") was an underwriter for the Offering. In the Offering, CastleOak agreed to purchase 285,000 Ally shares.

58. Defendant Mischler Financial Group, Inc. ("Mischler") was an underwriter for the Offering. In the Offering, Mischler agreed to purchase 285,000 Ally shares.

59. Defendant The Williams Capital Group, L.P. ("Williams Capital") was an underwriter for the Offering. In the Offering, Williams Capital agreed to purchase 285,000 Ally shares.

60. Defendant C.L. King & Associates, Inc. ("C.L. King") was an underwriter for the Offering. In the Offering, C.L. King agreed to purchase 237,500 Ally shares.

61. Defendant Lebenthal & Co., LLC ("Lebenthal") was an underwriter for the Offering. In the Offering, Lebenthal agreed to purchase 237,500 Ally shares.

62. Defendant MFR Securities, Inc. ("MFR") was an underwriter for the Offering. In the Offering, MFR agreed to purchase 237,500 Ally shares.

63. Defendant Samuel A. Ramirez & Company, Inc. ("Samuel Ramirez") was an underwriter for the Offering. In the Offering, Samuel Ramirez agreed to purchase 237,500 Ally shares.

64. Defendant Drexel Hamilton, LLC ("Drexel") was an underwriter for the Offering. In the Offering, Drexel agreed to purchase 190,000 Ally shares.

65.     Defendant Muriel Siebert & Co., Inc. ("Muriel Siebert") was an underwriter for the Offering. In the Offering, Muriel Siebert agreed to purchase 190,000 Ally shares.

66.     Defendant Telsey Advisory Group LLC ("Telsey") was an underwriter for the Offering. In the Offering, Telsey agreed to purchase 190,000 Ally shares.

67.     Defendant Toussaint Capital Partners, LLC ("Toussaint Capital") was an underwriter for the Offering. In the Offering, Toussaint Capital agreed to purchase 190,000 Ally shares.

68.     Defendant Academy Securities Inc. ("Academy") was an underwriter for the Offering. In the Offering, Academy agreed to purchase 166,250 Ally shares.

69.     Defendant Freeman & Co. Securities LLC ("Freeman") was an underwriter for the Offering. In the Offering, Freeman agreed to purchase 142,500 Ally shares.

70.     Defendant Wm Smith & Co. ("Wm Smith") was an underwriter for the Offering. In the Offering, Wm Smith agreed to purchase 142,500 Ally shares.

71.     Defendants Citigroup, Goldman Sachs, Morgan Stanley, Barclays, Merrill Lynch, Deutsche Bank, J.P. Morgan, Sandler O'Neill, Keefe, Credit Suisse, Evercore, RBC, Scotia, Credit Agricole, Raymond James, SG Americas, Guggenheim, Sanford, Global Hunter, Height, JMP, Loop Capital, Blaylock, CastleOak, Mischler, Williams Capital, C.L. King, Lebenthal, MFR, Samuel Ramirez, Drexel, Muriel Siebert, Telsey, Toussaint Capital, Academy, Freeman and Wm Smith are referred to collectively herein as the "Underwriter Defendants." The Underwriter Defendants each served as a financial advisor for, and assisted in the preparation and dissemination of, the Company's materially untrue and misleading Registration Statement and Prospectus.

72.     The Underwriter Defendants are primarily investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. As the underwriters of the

12

Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

73.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

74.     Representatives of the Underwriter Defendants also assisted the Company and Individual Defendants in planning the Offering.  They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

75.     In addition to having unlimited access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with their review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants were negligent in not knowing of the Company's undisclosed existing

problems and plans and the materially untrue statements and omissions contained in the Registration Statement, as detailed herein.

76.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the offer and sales of the Company's shares pursuant and/or traceable to the Offering and relevant offering materials, including to Plaintiff and the Class (defined below).

77.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the untrue and misleading statements in the Offering's Registration Statement and Prospectus.   The Underwriter Defendants' negligent due diligence investigation was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

### I.     ALLY FINANCIAL INC.

78.     Ally is one of the largest providers of automotive financing products, including wholesale loans and retail loans and leases, a leader in direct banking, and the 19th largest bank holding company in the United States based on total assets.  The Company was formerly known as GMAC Inc. and changed its name to Ally Financial Inc. in May 2010.  According to Ally's Registration Statement, as of December 31, 2013, Ally had "$151.2 billion of total assets and $52.9 billion of bank deposits" and serves "the financial needs of approximately 16,000 dealers in the United States and approximately 4 million of their retail customers."  Ally was founded in 1919 and is headquartered in Detroit, Michigan.  Ally's common stock is listed and traded on the NYSE under the ticker symbol "ALLY."

II.    **THE OFFERING AND THE COMPANY'S MATERIALLY UNTRUE AND INCOMPLETE REGISTRATION STATEMENT AND PROSPECTUS**

79.    On or around April 11, 2014, Ally conducted the Offering, selling 95,000,000 shares of Ally common stock at a price of $25 per share.  The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts, or omitted to state the facts necessary to make the statements not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.  Given the Individual Defendants' interest in ensuring a favorably high offering price, it is hardly surprising that the Company's Registration Statement, and Prospectus incorporated therein, presented a highly positive picture of the Company's business, performance, prospects, and products, while omitting crucial realities.

80.    The Company stated the following in its Registration Statement regarding its underwriting policies and credit risk management, in pertinent part:

**Credit Risk Management**

Credit risk is defined as the potential failure to receive payments when due from an obligor in accordance with contractual obligations. Therefore, credit risk is a major source of potential economic loss to us. Credit risk is monitored by enterprise and line of business committees and the Enterprise Risk Management organization. Together they oversee the credit decisioning and management processes, and monitor credit risk exposures to ensure they are managed in a safe-and-sound manner and are within our risk appetite. In addition, our Loan Review Group provides an independent assessment of the quality of our credit portfolios and credit risk management practices, and directly reports its findings to the Risk and Compliance Committee of the Board on a regular basis.

*To mitigate risk, we have implemented specific policies and practices across all lines of business, utilizing both qualitative and quantitative analyses, that reflect our commitment to maintain an independent and ongoing assessment of credit risk and credit quality.* Our policies require an objective and timely assessment of the overall quality of the consumer and commercial loan and lease portfolios. This includes the identification of relevant trends that affect the collectability of the portfolios, segments of the portfolios that are potential problem areas, loans and leases with potential credit weaknesses, as well as stress testing and the assessment of the adequacy of internal credit risk policies and procedures to monitor compliance with relevant laws and regulations. In addition, we maintain limits and underwriting policies that reflect our risk appetite.

15

> *We manage credit risk based on the risk profile of the borrower, the source of repayment, the underlying collateral, and current market conditions. We monitor the credit risk profile of individual borrowers and the aggregate portfolio of borrowers either within a designated geographic region or a particular product or industry segment. We perform ongoing analyses of the consumer automobile, consumer mortgage, and commercial portfolios using a range of indicators to assess the adequacy of the allowance based on historical and current trends.*

[Emphasis added.]

81.     The Company stated the following in its Registration Statement regarding its expansion in nonprime automotive lending, in pertinent part:

> Within our Automotive Finance operations, we are a full spectrum automotive finance lender with most of our loan originations underwritten within the prime-lending markets. *During 2013, we continued the execution of our underwriting strategy to prudently expand our originations across a broader credit spectrum to include used, nonprime, extended term, non-GM, non-Chrysler, and non-subvented.* Within our Mortgage operations, we sold our business lending operations to Walter Investment Management Corp., completed the sales of agency MSRs to Ocwen and Quicken, and exited the correspondent and direct lending channels. Our ongoing Mortgage operations are limited to the management of our held-for-investment mortgage portfolio. In the future, we may purchase mortgage loans as part of our held-for-investment mortgage portfolio.

[Emphasis added.]

82.     The above statements were materially untrue and misleading and omitted material information because, upon information and belief, at the time of the Offering, the Company failed to disclose: (1) the severity of rising subprime auto loan delinquency rates; (2) deficient underwriting measures employed in the origination of its subprime auto loans; and (3) aggressive tactics used with low-income borrowers (*e.g.*, pushing borrowers to limits beyond what they can afford, falsifying income) in order to raise approximately $2.375 billion in its April 2014 Offering.

83.     In addition, pursuant to Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto, including any known trends, issuers are required to disclose events or uncertainties that have had, or are reasonably likely to cause, the registrant's

financial information not to be indicative of future operating results. Any adverse events and/or uncertainties associated with demand for its products were reasonably likely to have a material impact on Ally's profitability and therefore, were required to be (but were not) disclosed in the Registration Statement under Item 303.

## THE TRUTH BEGINS TO EMERGE

84.     Unfortunately for investors, the truth concerning the nature and extent of the problems facing the Company did not begin to emerge until the Offering was complete, when, on October 29, 2015, Ally reported a 37% drop in quarterly profits, compared to the third quarter of 2014, due to its adaption of the lost leasing business of General Motors Co. ("GMC"). The Company had been trying to boost its market share by financing cars made by Ford Motor Co. and Nissan Motor Co. Ltd. after GMC replaced Ally as the exclusive lessor for Buick, GMC, and Cadillac vehicles in February 2015.

85.     On the same day, CFO Halmy said the deterioration reflects a decision Ally made a few years ago to take on riskier loans, but that credit was performing as expected, stating "[w]e're seeing no real credit trends that are disturbing[.]" Total auto loans made by Ally were down 6% at $11.1 billion. In a conference call on the same day, CEO Brown stated that "we've expanded risk appetite in the more non-prime flows[.]"

86.     On this news, Ally shares fell approximately 4.11%.

87.     On June 2, 2016, after the market closed, the *Wall Street Journal* published an article entitled "J.P. Morgan Chief James Dimon Sounds Alarm on Car Loans." The article stated following regarding the subprime auto lending market, in pertinent part:

> Mr. Dimon said that while he doesn't see an auto-market downturn as imminent, he does see increased risk due to higher default rates from increased subprime lending, the growing use of longer repayment periods for borrowers and the

17

potential for used-car prices to drop in coming years, which could hurt the value of
lenders' collateral when borrowers default.

\* \* \*

The auto-loan market is fragmented. The largest 20 lenders represented about 49%
of car loans given out in the fourth quarter, according to Experian. Ally Financial
Inc. and Wells Fargo & Co. are the two largest, each accounting for about 5.7% of
car loans given out in the fourth quarter.

Ally's CEO, Jeffrey Brown, played down risks among the company's auto
borrowers. "Our auto finance business is doing great and putting on better risk-
adjusted returns," he said at the Thursday investment conference. "We know fully
what we are originating...there are no skeletons in the closet."

88.    On the next day, June 3, 2016, an *Automotive News* article reported that Brown said
"Ally is dialing back on lending to consumers at the lower end of the subprime credit score
spectrum." The article also stated that "[e]xecutives at some of the biggest banks in auto lending
. . . [are] tapping the brakes on subprime lending, especially at the lower end of the credit
spectrum."

89.    On this news, Ally shares fell from $18.51 per share, on June 2, to $17.69 per share
on June 3, a drop of over 4.43%.

90.    Additionally, on June 14, 2016, a *Wall Street Journal* article entitled "Credit-Card
Warning Sends Synchrony Shares Dropping" stated the following in pertinent part:

*auto loans [] are weakening, suggesting that a new round of borrower
delinquencies and losses for financial institutions could be on the way.*

\* \* \*

*Plus, the creditworthiness of borrowers signing up for auto loans has been slowly
declining.* Borrowers who signed up for an auto loan or lease for a new car in the
first quarter had a credit score of 712 on average, down from 715 a year earlier,
according to Experian.

Lenders gave out $109.4 billion in subprime auto loans last year, up 11% from 2014
and nearly three times the low of $38.3 billion in 2009, according to credit-reporting
firm Equifax. Subprime auto loans account for a growing share of new auto loans,

18

making up nearly 19% of auto-loan balances given out last year, up from 13% in 2009.

[Emphasis added.]

91.    On this news, Ally shares fell from $17.03 per share, on June 13, to $16.08 per share on June 14, a drop of over 5.58%.

92.    On July 11, 2016, a *CNN Money* article entitled "U.S. government worried about risky car loans" stated that "The Office of the Comptroller of the Currency (OCC) cited 'unprecedented' growth in auto loans, rising delinquencies and shrinking used car values," as well as "pointed to cutthroat competition among banks, which has led them to relax underwriting standards." The article also stated the following regarding auto loans, in pertinent part:

> The OCC warned that banks face higher losses from bad auto loans and may need to set aside more money to cushion against those losses. Some lenders' risk management practices "have not kept pace with the growth and increasing risk in these portfolios," the regulator said.

93.    On July 28, 2016, the *Wall Street Journal* published an article entitled "Alarm Bells for Auto Loans" reported the following, in pertinent part:

> Four of the largest auto lenders by loan volume – Ally Financial, Wells Fargo, J.P. Morgan Chase and Capital One Financial -- said on second-quarter earnings calls that used-cars prices are at risk of falling. Ally's finance chief Christopher Halmy this week said pressure on used-car prices could grow as cars getting leased now return to the market in three years.
>
> * * *
>
> Declining values would be an additional issue for the auto-loan industry, where default expectations for subprime loans are rising.
>
> * * *
>
> Ally's Mr. Halmy said the cars getting leased today are "the biggest concern" for used-car prices. He added that used-car prices have held up better than expected so far.

19

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

94.    Plaintiff brings this action as a class action on behalf of a Class consisting of all those who purchased the Company's common stock pursuant or traceable to the Company's Offering and Registration Statement, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company at all relevant times; members of their immediate families, and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

95.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class. The members of the proposed Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

96.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

97.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

98.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether the Prospectus and Registration Statement contained materially false and misleading statements and omissions; and

c. to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

99. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM
### Violations of §11 of the Securities Act
### Against All Defendants

100. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101. This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants.

102. The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

103. The Company is the issuer of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially untrue statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

104. The Individual Defendants each signed or authorized the signing of the Registration Statement. As such, each is strictly liable for the materially inaccurate statements contained in the

21

Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

105.   The Underwriter Defendants each served as underwriters in connection with the Offering. As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. These Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements

made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

106. By reason of the conduct herein alleged, each Defendant violated §11 of the Securities Act.

107. Plaintiff acquired the common stock pursuant or traceable to the Registration Statement, and without knowledge of the untruths and/or omissions alleged herein. Plaintiff sustained damages, and the price of the Company's common stock declined substantially due to material misstatements in the Registration Statement.

108. This Claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

109. By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants, and each of them, jointly and severally.

## SECOND CLAIM
### Violations of §12(a)(2) of the Securities Act
### Against All Defendants

110. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

111. This Claim is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against each of the Defendants.

112. Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the Offering. Defendants issued, caused to be issued, and signed the Registration Statement in connection with the Offering. The Registration Statement was used to

induce investors, such as Plaintiff and the other members of the Class, to purchase the Company's shares.

113.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.  Defendants' acts of solicitation included participating in the preparation of the materially untrue and incomplete Registration Statement.

114.    As set forth more specifically above, the Registration Statement contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

115.    Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement.

116.    The Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects.  Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

117.    This Claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after the Company's shares were sold to the Class in connection with the Offering.


### THIRD CLAIM
#### Violations of §15 of the Securities Act
#### Against the Individual Defendants

118.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

119.    This Claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.

120.    The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act. By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants, individually and collectively, had the power to influence, and exercised the same, over the Company to cause it to engage in the conduct complained of herein.

121.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act. As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiff as Class Representative;

B.    Awarding Plaintiff and the other members of the Class compensatory damages;

C.    Awarding Plaintiff and the other members of the Class rescission on their §12(a)(2) claims;

25

D.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.    Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.

DATED: October ___, 2016          **FINK + ASSOCIATES LAW**

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
38500 Woodward Ave., Suite 350
Bloomfield Hills, MI 48304
Telephone: 248-971-2500
Facsimile: 248-971-2600
Email: dfink@finkandassociateslaw.com
          dbressack@finkandassociateslaw.com

Donald A. Broggi
Thomas L. Laughlin
Joseph V. Halloran
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
Email: dbroggi@scott-scott.com
          tlaughlin@scott-scott.com
          jhalloran@scott-scott.com

26

David R. Scott
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile:  860-537-4432
Email: david.scott@scott-scott.com

Geoffrey M. Johnson
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH  44106
Telephone: 216-229-6088
Facsimile:  860-537-4432
Email: gjohnson@scott-scott.com

*Attorneys for Plaintiff Bucks County Employees
Retirement Fund*